IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| THOMAS E. LOYD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 09-0619-CV-W-ODS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying his applications for disability benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in April 1958 and has a high school diploma. After serving in the military, he worked as a custodian, delivery driver, dishwasher, groundskeeper, packer, security guard and warehouseman. He last worked on August 31, 2003, which he alleges to be the date his disability began. He rests his disability claim primarily on pain in his back and right knee, although he suffers from other maladies including obesity and degenerative osteoarthritis in his right shoulder. Plaintiff's insured status expired on December 31, 2008, so to obtain benefits he must demonstrate he was disabled before that date.

Plaintiff has obtained almost all of his medical care from the VA Hospital. In April 2003 (four months before his alleged onset date), Plaintiff went to the emergency room complaining of chest pains and was discharged three days later. He had a normal EKG and it was never established that he had a heart attack. Among other directives at discharge, Plaintiff was told to lose weight: at the time, he was six feet tall and weighed

323 pounds. R. at 159-61, 288, 292.[1]  Tests performed in follow-up visits were negative for infarction or ischemia. R. at 157-58.

In July 2003, Plaintiff complained of pain in his back and numbness in his hand. His range of motion was normal, although tenderness was noted at T2-5. In August, he received trigger point injections and was told to massage the tender points with a tennis ball. R. at 255-56. He later admitted that he had engaged in "minimal exercise" and had not massaged with the tennis ball; nonetheless, he was again advised to stretch and exercise. R. at 252-54. In November 2003, he reported experiencing no pain: he reported changing jobs to one that did not involve heavy lifting.[2] Plaintiff also reported obtaining relief from an over-the-counter knee brace, so e was advised to continue wearing it. R. at 249.

Plaintiff returned in March 2004 for a routine visit. He complained of chronic back and knee pain that he rated at 3 on a scale of 1 to 10. He was told to lose weight through a combination of exercise and diet. R. at 243-46. Plaintiff had another "routine appointment" in August 2004, at which time he rated his pain at 4 out of ten. He also reported that had had not worked for a year and that he "watches grandchildren during the day." He was told to decrease his tobacco use[3] and to engage in low impact exercises. Concern regarding Plaintiff's blood sugars and the possibility of diabetes were also expressed. R. at 242-43.[4] Two weeks later, Plaintiff reported that he felt

---

[1]Plaintiff weighed between 320 pounds and 330 pounds for most of the approximately five years relevant to this case. E.g., R. at 240, 383 (medical records recounting Plaintiff's weight over time). The Court will not detail each and every occasion upon which he was advised to lose weight through a combination of diet and exercise.

[2]The Court does not know how to reconcile this statement with the information indicating Plaintiff last worked in August 2003.

[3]Plaintiff also smoked during much if not all of the time period in question. The Court will not recount the many occasions when Plaintiff was advised to curtail his tobacco use.

[4]Plaintiff also complained of photophobia during this visit, which he alludes to in his legal argument. However, there is no further mention of this condition in any of

weak after playing volleyball with his children; the doctors attributed this to Plaintiff's uncontrolled blood sugars. R. at 240.

In January 2005, Plaintiff went to the emergency room complaining of low back pain that he rated at 8 out of 10. He was administered an injection of an anti-inflammatory (Toradol), after which he reported that the pain was reduced to 3 out of 10. Reports from radiology revealed diffuse sclerosis and narrowing of the vertebrae at L4-L5 and L5-S1. The physician notes also indicate the possibility that Plaintiff was suffering from a kidney stone. R. at 237-39. Plaintiff returned approximately eleven days later for a routine diabetes follow-up and reported no complaints. He mentioned his ER visit from earlier in the month, but declared that his pain had resolved. Plaintiff exhibited normal circulation, normal motor control, and normal sensation. R. at 255.

In April 2005, Plaintiff complained of pain in his knee, back and ankle. He had been taking Naproxen, but he indicated that it no longer provided relief. The doctor explained that it was possible to build up a tolerance and suggested Plaintiff switch to another medication and switch back to Naproxen at a later time. The doctor prescribed etodolac in place of Naproxen. R. at 230-32. Plaintiff then underwent a course of physical therapy and electric stimulation for his knee, which was helpful and reduced the pain to no higher than 4 out of 10. R. at 225-29. After that, he had surgery to remove his kidney stones. R. at 224.

In June 2005, Plaintiff complained of burning pain in his right leg, running from his knee to his calf. He also complained that his knee buckled occasionally. He rated the pain at 6 out of 10 and related that the etodolac "alleviates some pain." He was told to exercise and lose weight in order to decrease the stress on his joints. R. at 221-22. In November, the doctor described Plaintiff's diabetes as "poorly controlled." R. at 205. In January 2006, Plaintiff reported pain in his wrists and back that he rated at 6 out of 10. He explained that he had worn wrist splints due to carpal tunnel syndrome for three

---

Plaintiff's medical records, and there is no indication his doctor thought it was particularly serious.

years, but they had worn out.  A prescription was written so he could obtain replacements.  R. at 196-97.

In April 2006 – after the removal of more kidney stones – Plaintiff reported no pain in his kidneys but pain in his shoulder and the middle of his back.  He was still smoking but his blood pressure was controlled, and he was advised to exercise, diet, and lose weight.  R. at 186.  The following month, Plaintiff complained of shoulder pain caused when his dog pulled on the leash.  X-rays revealed mild degenerative arthritis and Plaintiff was directed to apply a moist heating pad to his shoulder.  R. at 183.

In July 2006, Plaintiff complained about pain in his back that he rated at 7 out 10, and he was told to exercise "at least 30 minutes 3 times per week" and reduce his weight.  Plaintiff expressed interest in the MOVE weight management program, and his doctor concurred that he might benefit from that and made the referral.  R. at 397-99.  Plaintiff began the program on August 1, but the exercise portion of the program was delayed because Plaintiff reported experiencing shortness of breath, balance problems, and uncontrolled chronic medical conditions.  Even though Plaintiff's doctor recommended exercise generally and the MOVE program specifically, a notation in Plaintiff's records states "the patient can work on nutrition issues, [but] increased physical activity is not recommended without further evaluation by the primary care provider."  The record also states that Plaintiff's report of stress, anxiety, and smoking "may make changing behaviors related to weight management more difficult . . . ."  R. at 394-95.

In September, Plaintiff went to the VA clinic for an initial evaluation for physical therapy related to his back.  At that time he also asked the doctor to complete the paperwork for his disability claim, but Plaintiff was directed to another doctor for that purpose.  Plaintiff also expressed interest in receiving a TENS unit for his back.  Plaintiff was told to obtain a referral to physical therapy from his primary doctor.  R. at 391.  There is no indication that Plaintiff followed up on this directive; instead, he pursued receipt of a TENS unit.  During that process, Plaintiff reported a four-year history of chronic pain in his upper back that radiated into his neck.   His range of motion in all joints was within normal limits, his strength was normal, and there was no muscle

4

atrophy in any of his extremities.  Radiological findings consisted of mild degenerative osteoarthritis in his right shoulder and thoracic spine, but no evidence of bone trauma or destruction.  He was told to continue using a heating pad, continue using etodolac, and provided a TENS unit.  R. at 388-89

In January 2007, Plaintiff appeared for a regular appointment complaining of constant back pain that was worse with movement; he rated the pain at 6 out of 10.  He reported he was out of medicine but "with medicine, pain is controlled, takes edge out of pain, and able to go to sleep."  Plaintiff's diabetes was still uncontrolled, and he reported increased anxiety because he was attempting to quit smoking.  His diabetes medication was increased, an antidepressant was prescribed, and his pain medication was refilled.  R. at 380-81.  In May, Plaintiff appeared for another regular appointment; this time, his neck and low back pain were rated an 8 out of 10.  He said that morning his right arm was cold for fifteen minutes – which had never happened before.  His hydrocodone (which had been prescribed at some point in time) was increased and x-rays were arranged.  R. at 377-79.  In September, Plaintiff reported tingling in his hands and arms.  His gait was normal and no trigger points were found.  A nerve conduction test was performed, and the only positive finding indicated carpal tunnel syndrome in the right arm.  A referral to occupational therapy to obtain wrist splints was contemplated; if that failed to provide relief, the possibility of surgery would be considered.  R. at 370-71.  Plaintiff also indicated he was "not interested in [the] MOVE program."  R. at 369.  He obtained the wrist splints from occupational therapy in early October.  R. at 365-66.  In April 2008, Plaintiff sought and received a new knee brace.  He reported that "weather changes bother his knees and back" but there is no mention of chronic or severe pain.  R. at 414-16.

In connection with his application, Plaintiff provided a Function Report that is dated May 27, 2006.  In this report, Plaintiff was asked to describe his daily activities.  He wrote

> When I get up, I walk the dogs, clean house, fix meals, drive stepson to school and pick him up.  Drive fiancé to work and pick her up, walk dogs throughout the day and watch some TV.

R. at 114; see also R. at 115.  He indicated he prepared "simple foods so that I don't have to stand in the kitchen very long as it hurts my back.  10 to 15 min."  R. at 116.  However, he also indicated he spent thirty minutes a day vacuuming and doing other housework, an hour every two weeks shopping, that he is able to travel by walking, driving or riding in a car alone, that he goes outside every two hours, and goes fishing once a month.  R. at 116-18.  He also reported that he could not "squat, bend, stand, walk, sit, reach without having a lot of pain in back."  R. at 119.

The administrative hearing was held on August 22, 2008.  He described the "main thing" that kept him from working as pain in his back and right knee.  R. at 24.  He reported taking hydrocodone and methocarbamol, wearing a knee brace, and using a TENS unit. R. at 24-25.  The wrist splints discussed previously are worn at night.  R. at 25.  He testified that he could sit for twenty to thirty minutes and could sit for twenty to thirty minutes, walk approximately two blocks, and could lift something that weighed between a gallon of milk and his (eleven pound) granddaughter.  R. at 26-27.  He spends much of his time laying down.  R. at 27-28.  He also reported numbness in his hands in feet, but did not indicate how often or when this occurred.  R. at 28.

The ALJ posed questions to a Vocational Expert.  The first question presumed a person of Plaintiff's age, education and work history who was limited to light work, could occasionally crouch and crawl and was limited in his ability to use his right arm for overhead lifting.  The VE testified such a person could perform his prior job as a security gate guard.  R. at 32-33.  The second question presumed that due to pain the person also could not maintain persistence, pace, attention and concentration for more than two hours, at which time he would need a brief break.  The VE testified such a person could be employed as a security gate guard because "as typically performed that individual should have a break every two hours."  R. at 33.  The third question presumed a person whose pain required him to lie down occasionally at will.  The VE testified such a person could not perform any work.  R. at 33-34.

The ALJ found Plaintiff was limited as described in his second question.  He arrived at this conclusion based on the medical reports indicating Plaintiff had a full

6

range of motion and strength, minimal radiological findings, and his reports of daily activities.  R. at 12-13.

## I.  DISCUSSION

Plaintiff's arguments coalesce around a single theme: that the ALJ's factual findings are not supported by substantial evidence in the record as a whole.  He faults the ALJ's determination that Plaintiff was not credible and the resulting assessment of Plaintiff's residual functional capacity.  "[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision.  Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).  Plaintiff's arguments coalesce around a single theme: that the ALJ's factual findings are not supported by substantial evidence in the record as a whole.  He faults the ALJ's determination that Plaintiff was not credible and the resulting assessment of Plaintiff's residual functional capacity.

The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain he experiences.  Cf. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). The familiar standard for analyzing a claimant's subjective complaints of pain is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the
> disability results from a medically determinable physical or
> mental impairment, direct medical evidence of the cause and
> effect relationship between the impairment and the degree of
> claimant's subjective complaints need not be produced. The
> adjudicator may not disregard a claimant's subjective
> complaints solely because the objective medical evidence
> does not fully support them.
>
> The absence of an objective medical basis which supports
> the degree of severity of subjective complaints alleged is just
> one factor to be considered in evaluating the credibility of the
> testimony and complaints. The adjudicator must give full
> consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work
> record, and observations by third parties and treating and
> examining physicians relating to such matters as:
>
> > 1. The claimant's daily activities;
> > 2. the duration, frequency and intensity of the pain
> > 3. precipitating and aggravating factors;
> > 4. dosage, effectiveness and side effects of medication;
> > 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's
> subjective complaints solely on the basis of personal
> observations. Subjective complaints may be discounted if
> there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

Plaintiff's testimony is contradicted by substantial evidence in the record. He never told doctors he suffered from the same degree of pain he described at the hearing, and his doctors never suggested he suffered from a medical condition that would cause the degree of pain he described. None of his doctors provided a residual functional assessment indicating Plaintiff suffers from limitations of the sort he testified to. To the contrary, they advised him to exercise. Plaintiff's testimony about his daily activities is inconsistent with his own prior statements. On appeal he downplays his activities, but the ALJ was entitled to find that caring for his grandchildren, chauffeuring

8

them and his fiancé, walking dogs "throughout the day," and other activities described in his written statement are inconsistent with Plaintiff's later claim of disabling pain.

Plaintiff also contends his functional capacity is more limiting than found by the ALJ. He emphasizes the diagnoses pronounced by doctors, but this misses the point. For instance, the fact that Plaintiff suffers from diabetes does not, by itself, add anything to the analysis. The critical question is whether and to what extent diabetes – or any other medical condition – limits Plaintiff's activities. Plaintiff also faults the ALJ for failing to consider the combined impact of Plaintiff's impairments. To the contrary, the ALJ considered the combined impact of all impairments he found to exist. Thus (for instance), there is no error in the ALJ's failure to specifically consider the fact that Plaintiff is an insulin-dependant diabetic, there is no error because the Record does not demonstrate any functional limitations arising from this medical condition.

### III.  CONCLUSION

The ALJ is charged with resolving factual disputes. There is evidence in the Record to support Plaintiff's claim, but the ALJ found it unpersuasive. The Court concludes there is substantial evidence in the Record as a whole to support the ALJ's decision, so it is affirmed.

IT IS SO ORDERED.

                                                  /s/ Ortrie D. Smith
                                                  ORTRIE D. SMITH, JUDGE
DATE: June 28, 2010                    UNITED STATES DISTRICT COURT